# 2004 DTA 116

### TRIBUNAL DE CIRCUITO DE APELACIONES
### REGIÓN JUDICIAL DE SAN JUAN
### PANEL I

RADAMES ACOSTA Y CARMEN SAMPSON EN REPRESENTACIÓN
DE LA SOCIEDAD LEGAL COMPUESTA POR AMBOS
Apelantes

v.

JOSÉ MANUEL TORRES EN SU CAPACIDAD PERSONAL COMO DIRECTOR REGIONAL DE UNITE;
Y VICEPRESIDENTE INTERNACIONAL UNITE; UNIÓN OF NEEDLE TRADES INDUSTRIAL
AND TEXTILE EMPLOYEES UNITE; UNIÓN OF NEEDLE TRADES INDUSTRIAL AND
TEXTILE EMPLOYEES (UNITE) AFL-CLO, CLC INTERNATIONAL Y EDGAR ROMNEY EN SU
CAPACIDAD PERSONAL POR SÍ Y EN REPRESENTACIÓN DE LA SOCIEDAD LEGAL COMPUESTA
CON JANE DOE VICEPRESIDENTE EJECUTIVO DE UNITE; COMPAÑÍA DE SEGUROS ABC
Y COMPAÑÍA DE SEGUROS DEF
Apelados

Núm. KLAN-02-00785

San Juan, Puerto Rico, a 18 de junio de 2004

Panel integrado por su Presidente, el Juez Brau Ramírez,
y los Jueces González Rivera y Rivera Martínez

Rivera Martínez, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

El 29 de julio de 2002, el Sr. Radamés Acosta, Carmen Sampson y la Sociedad Legal de Gananciales compuesta por ambos presentaron escrito de apelación. Mediante el mismo, solicitan la revisión de la sentencia emitida el 19 de junio de 2002, por el Tribunal de Primera Instancia, en el caso *Radamés Acosta y otros v. José Manuel Torres en su capacidad personal como director de UNITE, y otros*, caso civil número KPE98-0758. Dicha sentencia fue archivada en autos y notificada a las partes el 26 de junio de 2002.

La aludida sentencia declaró no ha lugar la demanda incoada por el Sr. Radamés Acosta (en adelante parte apelante).

El 28 de agosto de 2002, la parte apelante presentó ante nos moción al amparo de la Regla 19 del antiguo Reglamento del Tribunal de Circuito de Apelaciones. Mediante dicha moción, la parte apelante justificó la necesidad de utilizar la prueba testifical presentada en el juicio. Esto, ya que alegan que los errores discutidos en el escrito de apelación se fundan en que el Tribunal de Primera Instancia no tomó en consideración la prueba testifical y documental presentada por la parte demandante-apelante. A esos efectos, dicha parte presentó ante nos, en conjunto con la referida moción, un proyecto de exposición narrativa de la prueba oral.

El 17 de septiembre de 2002, la parte apelada presentó moción en oposición a exposición narrativa de la prueba oral del apelante.

Así las cosas, mediante resolución de 20 de septiembre de 2002, este foro procedió conforme a lo establecido en la Regla 76 del antiguo Reglamento del Tribunal de Circuito de Apelaciones, ordenando a la parte apelante a presentar la transcripción de la prueba oral, concediéndole para ello un término de cuarenta y cinco (45) días a partir de la notificación de la referida resolución.

Luego de varios tramites procesales la parte apelante presentó ante nos, la transcripción de la prueba oral presentada ante el Tribunal de Primera Instancia.

Así las cosas, el 21 de febrero de 2003, este foro concedió un plazo de quince (15) días a la parte apelada para que informara cualquier reparo que tuviera en cuanto a la transcripción de la prueba presentada, concediéndole a su vez, el término de treinta (30) días para presentar su alegato. No habiendo cumplido con lo ordenado, el 17 de junio, este Tribunal emitió nuevamente resolución, concediéndole a la parte apelada el término de diez (10) días adicionales, como plazo de última oportunidad para comparecer ante nos. No habiendo comparecido dicha parte en el plazo concedido, procedemos a resolver el caso de autos, sin el beneficio de su comparecencia.

Luego de un ponderado análisis del escrito de apelación, la sentencia recurrida, la transcripción de la prueba oral y el derecho vigente, resolvemos confirmar la sentencia apelada. Veamos.

## I

La UNITE es una organización laboral que representa a obreros de la industria de la aguja y textiles. Esta fue creada por medio de una fusión entre la *"International Ladies Garment Worker's Union"* (en adelante ILGWU) y la Amalgamated Clothing and Textile Worker´s Union (en adelante la ACTWU), cuya fusión a nivel nacional quedó oficialmente plasmada por medio de un voto de ratificación llevado a cabo el 1 de junio de 1995.

A esos fines, en Puerto Rico fue necesario que los líderes de las locales de ILGWU y ACTWU firmaran un *"Acuerdo de Afiliación"*, el cual firmaron el 27 de abril de 1996. Bajo este acuerdo, el director regional de ILGWU, José Torres, pasó a ocupar el puesto de gerente regional de UNITE y el entonces director regional de ACTWU, ocupó la posición de asistente de director regional. A esos efectos, estos puestos pasaron a ser los de mayor jerarquía y responsabilidad dentro de la nueva organización fusionada.

El 10 de abril de 1989, el apelante Radamés Acosta comenzó a trabajar con la ILGWU como organizador. Posteriormente, el 30 de agosto de 1989, fue promovido a *"lead organizer"* o director de organización. Básicamente, como Director de Organización, sus responsabilidades eran reclutamiento de nuevos miembros para la unión, organizar procesos huelgarios, atender casos de descertificación de talleres, entre otras. Todo esto, bajo la consulta del Director Regional de la Región de Puerto Rico, que en ese momento era el Sr. José Torres y en consulta directa con la oficina de Nueva York. Mediante dicha posición, el apelante dirigía a nivel local las operaciones de la unión en cuanto a la sindicalización de obreros no representados por alguna unión. Cabe señalar que, como director de organización, el apelante recibía dos veces el salario de un organizador o agente de negocios.

El 2 de septiembre de 1992, además de ocupar el puesto de organizador, el apelante fue nombrado a ocupar el puesto de asistente de director regional de la IGLÚ. ▋ Esta posición añadió otras tareas administrativas a las que ya tenía el apelante como director de organización. En esencia, el asistente de director regional es la persona que asiste al Director Regional en la dirección de la unión o de la región, en este caso de Puerto Rico. Básicamente, esta designación incluia, sustituir al Director Regional cuando éste se ausentara de la Oficina.

Posteriormente, para el año 1992, mientras el apelante fungía como director de organización y asistente de director de la ILGWU, fue enviado como agente de negocios a solucionar un problema en la fábrica de Barranquitas Mills. Dicho problema era de tal magnitud que fue necesario trasladar las operaciones del departamento de organización a la fábrica de Barranquitas Mills y contratar varios empleados de la fábrica como organizadores. El aludido asunto le tomó al señor Acosta alrededor de dos años en resolver. Proceso que fue resuelto de manera satisfactoria para la unión en el mes de febrero de 1995.

Ahora bien, para ese mismo tiempo, se habían comenzado los trámites de la fusión entre la ILGWU y ACTWU, los cuales culminaron en su afiliación a nivel nacional, el 1 de junio de 1995, bajo el nombre de UNITE. En Puerto Rico, la aludida fusión fue ratificada el 27 de abril de 1996. Cabe señalar que uno de los propósitos de la fusión, era la de unir fuerzas dentro de un mercado común. Sin embargo, para esta misma fecha comenzaron a surgir otros problemas para la nueva entidad creada que no se habían anticipado, como el cierre de varias fábricas y cesantía de miles de empleados miembros de UNITE.

El cierre de fábricas trajo como consecuencia la reducción masiva de empleados de la unión, los cuales servían a estas fábricas como agentes de negocios. También y a raíz de lo anterior, fue necesario la cesantía de los organizadores de la unión y el 16 de febrero de 1996 se efectuó el cierre del Departamento de Organización donde trabajaba el apelante. Posteriormente, la situación llegó a ser tan precaria que el 30 de junio de 2001, UNITE cerró definitivamente operaciones en Puerto Rico y despidieron a todos sus empleados con excepción de los empleados administrativos que atienden los asuntos relacionados al plan médico, para aquellos empleados cesanteados que optaron por continuar con la cobertura del mismo.

Mientras el apelante se encontraba trabajando como Agente de Negocios en la fábrica de Barranquitas Mill y mientras se avecinaba el cierre del Departamento de Organización de la ILGUW donde el apelante laboraba, el apelante se reportó al Fondo del Seguro del Estado (en adelante el FSE), el 9 de octubre de 1992. Esto, a raíz de una recomendación efectuada por la doctora Luca.

De la transcripción se desprende que el apelante acudió donde la doctora Luca, ya que se encontraba atravesando por una situación en el empleo, alegadamente producto del comportamiento hostil, agresivo y violento de parte del señor Torres.

El apelante alega que la actitud del señor Torres comenzó a tornarse hostil para el mes de diciembre de 1993, cuando el apelante compareció a testificar a los Estados Unidos en un procedimiento de una querella que radicara la secretaria del señor Acosta sobre hostigamiento sexual contra el señor Torres. Según alega, dicha actitud hostil consistió en que, por ejemplo, el señor Torres excluia al apelante de todas las reuniones de staff; cuando llegaron vehículos nuevos para ser repartidos entre el staff de la Unión, el señor Torres le dio uno viejo al apelante; fue excluido tanto de las negociaciones del convenio colectivo como de todas las comunicaciones de la organización; el señor Torres interfería en el pago de los reembolsos del trabajo del apelante y le quitó las tarjetas de crédito, entre otras.

Así las cosas, el apelante fue dado de alta del FSE el 24 de junio de 1996. Para la fecha en que el demandante fue dado de alta por el FSE, el Departamento de Organización ya había sido cerrado por la ILGWU cuatro meses antes por razón de economía y todos los empleados que allí laboraban habían sido despedidos, incluyendo al demandante. Por lo que a la fecha en que el apelante solicita la reposición de su empleo, dicha plaza no existía.

El 25 de agosto de 1998, el Sr. Radamés Acosta y su esposa Carmen Sampson y la Sociedad Legal de Gananciales compuesta por ambos presentaron demanda contra el Sr. José Torres, en su capacidad personal y como vicepresidente de la UNITE. Dicha demanda fue posteriormente enmendada el 24 de junio de 1999 para traer al pleito a la UNITE.

Mediante la aludida demanda, la parte apelante solicitó indemnización de daños y perjuicios por despido ilegal a tenor con le Ley Núm. 45 del 18 de abril de 1935, 11 L.P.R.A. sec. 7 (en adelante Ley de Compensación por Accidentes del Trabajo).

En síntesis, la parte apelante alegó en dicha demanda que trabajó en la UNITE desde 1989 hasta el 10 de julio de 1996, fecha en que fue despedido. Alegó igualmente que, para la fecha de su despido, ostentaba la

posición de Director de Organización y Asistente al Director de la ILGWU en Puerto Rico. No obstante, señala que al momento de su despido estaba reportado al FSE por una condición emocional, por lo que conforme a lo establecido en la Ley de Compensación por Accidente en el Trabajo, el patrono debía reservar su empleo por un año a partir de la fecha de la enfermedad, según lo requiere el Artículo 5A de la referida Ley. A su vez, expuso que había sido hostigado, discriminado y atacado por el Sr. José Torres para que éste renunciara, creándole de igual forma un record negativo con el propósito de justificar el despido. Además señaló, como mencionáramos, que la campaña en su contra comenzó luego que el apelante testificara contra el Sr. José Torres en la Oficinas Centrales de la Unión en Nueva York en un caso de hostigamiento sexual.

A esos efectos, la parte apelada contestó la demanda y la demanda enmendada y levantó diversas defensas afirmativas, incluyendo entre éstas la del cierre por razones económicas del Departamento de Organización en la que laboraba el apelante. Por tal razón, alegó el patrono que no era necesario reservar su empleo, ya que el mismo no subsistía al momento que fue dado de alta.

**Durante el trámite procesal habido en el caso de autos, la parte demandada-apelada presentó ante el Tribunal de Primera Instancia moción de sentencia sumaria. En la misma alegaron. que el demandante no cumplía con las disposiciones de la Ley de Compensaciones por Accidentes en el Trabajo, así como tampoco con los requisitos que establece la Ley de Despido Injustificado, Ley Núm. 80 de 30 de mayo de 1976. Así las cosas, solicitaron que el Tribunal de Primera Instancia dictara sentencia sumaria a favor de la parte apelante, puesto alegan que los hechos en este caso no se encuentran controvertidos y además de que no aducen la concesión de un remedio. A esos fines, el Tribunal de Primera Instancia declaró no ha lugar a la moción de sentencia sumaria presentada.** ▮

Luego de varios trámites procesales, el 22 de enero de 2001, se celebró en el caso de autos, la conferencia con antelación al juicio. En la misma, las partes presentaron el informe de conferencia preliminar entre abogados, el cual quedó aprobado. Posteriormente, se señaló el juicio en su fondo para el 15 de enero de 2002. En ese día, las partes discutieron, marcaron y estipularon la evidencia a presentarse ante el Tribunal de Primera Instancia.

La vista en su fondo continuó el 16 de enero de 2002. En dicha vista, las partes comenzaron el desfile de la evidencia. A esos efectos, la evidencia testifical de la parte demandante consistió en el testimonio de los demandantes Radamés Acosta, su esposa Carmen Sampson y la testigo Cecilia García Rivera. Por otro lado, la prueba testifical de la parte demandada consistió en el testimonio del testigo Sr. Edgar Romney, secretario tesorero de la UNITE quien testificó a través de un intérprete debidamente cualificado y juramentado.

El 19 de junio de 2002, el Tribunal de Primera Instancia dictó sentencia. En la misma declaró no ha lugar la demanda incoada por la parte demandante-apelante, ya que concluyó que al momento de solicitar reintegrarse a su puesto, éste había sido eliminado, por lo que hubo justa causa por parte del patrono. Asimismo dispuso que no procedía que el patrono le ofreciera otras posiciones y que la acción de daños y perjuicios de los demandantes se encontraba prescrita.

Inconforme con dicha determinación, los apelantes presentaron ante nos el correspondiente escrito de apelación. En el mismo indicaron que el Tribunal de Primera Instancia incidió en la comisión de varios errores, a saber: (1) que erró el tribunal recurrido al no tomar en consideración la evidencia presentada en relación con la fecha en que se despide al demandante-apelante, lo que ocurrió durante el período que el señor Acosta se encontraba bajo tratamiento en el FSE violando el Art. 5A de la Ley de Compensaciones por Accidentes en el Trabajo, al ser despedido antes de que se hiciera efectiva en Puerto Rico la fusión de las dos Uniones; (2) que erró el tribunal recurrido, al no determinar que el despido fue producto de un subterfugio del patrono; (3) que erró, al no tomar en consideración la evidencia de las labores que el apelante había llevado a cabo durante su carrera y recientemente en la Unión, al determinar que no tenía obligación la Unión de reponerlo a una posición

fuera de su clasificación ocupacional, cuando éste había ejercido diferentes funciones en la Unión y por tanto podía ser restituido a cualquiera de ellas, ya que tenía la capacidad para hacer el trabajo y más antigüedad que cualquier empleado de la Unión, por lo que correspondía a la Unión ofrecerle esa alternativa al apelante, y como cuarto (4) señalamiento de error, el apelante plantea que la interpretación restrictiva de la Ley 80 en sus incisos 185b y 185c efectuada por el Tribunal de Primera Instancia no es cónsona con el propósito remediador y protector de la Ley. A su vez, plantea que el Tribunal de Primera Instancia no contempló que la clasificación ocupacional del empleado depende de la influencia del patrono sobre las funciones, las cuales incluian deberes adicionales a los de Director del Departamento de Organización y Subdirector de la Unión.

## II

Antes de comenzar, procede que discutamos el ámbito de los tribunales apelativos ante las controversias relativas a la evaluación de la prueba que realizó el Tribunal de Primera Instancia.

Sabido es que los tribunales apelativos debemos dar deferencia a las determinaciones de hechos y a la adjudicación de credibilidad que haga el Tribunal de Primera Instancia. Tal proceder es consecuencia de que, es ante dicho tribunal, que desfila toda la prueba, tanto documental como testifical. A su vez, dicho foro es quien tiene la oportunidad de observar y aquilatar la prueba, según el derecho aplicable y de acuerdo a su sano juicio.

Por su parte, el Tribunal Supremo ha resuelto que *"[c]orresponde al tribunal sentenciador aquilatar la prueba testifical ofrecida y dirimir su credibilidad. En razón de ello, repetidamente hemos establecido que en asuntos de credibilidad de la prueba concederemos gran deferencia a las determinaciones de hechos efectuadas por los tribunales de instancia."* Trinidad García v. Chade, **2001 J.T.S. 10**, 793. En ausencia de error, pasión, prejuicio y parcialidad, la apreciación de la prueba hecha por el Tribunal de Primera Instancia no debe ser cuestionada, pues el foro apelativo no puede prescindir de, y permutar por sus propias apreciaciones, las determinaciones tajantes y ponderadas del foro de instancia, ya que estas decisiones estarían basadas únicamente en un examen del expediente del caso. Véase *Argüello López v. Argüello García*, **2001 J.T.S. 127**, 94; *Rolón García y otros v. Charlie Car Rental*, 148 D.P.R. 89 (1999), (Citando a *López Vicil, infra.*); *López Vicil v. ITT Intermedia Inc.*, 142 D.P.R. 857, 864 (1997).

Ahora bien, de lo anterior no surge una incapacidad absoluta de los tribunales apelativos, sino que siempre que una parte demuestre ante nos que la decisión del Tribunal de Primera Instancia estuvo basada en pasión, prejuicio o parcialidad, entraremos a evaluar la prueba presentada.

## III

Tomando como base los preceptos legales anteriormente expuestos, pasemos a atender los señalamientos de error planteados por el apelante.

Primeramente, el apelante señala que erró el Tribunal de Primera Instancia al no tomar en consideración la evidencia presentada en relación con la fecha en que se despide al apelante de la unión. Esto, ya que alega que fue despedido antes de que se hiciera efectiva en Puerto Rico la fusión de las dos Uniones y mientras se encontraba recibiendo tratamiento en el FSE. A esos efectos, el apelante argumenta que el Tribunal de Primera Instancia realizó un análisis simplista de los hechos del caso de marras, toda vez que concluyó que cuando el demandante solicita de nuevo su trabajo, el mismo no existía porque el Departamento de Organización había perdido muchos miembros y/o debido a que el departamento de organización había cerrado. Así las cosas, señala que el tribunal recurrido no tomó en consideración la pieza de evidencia más importante que se presentó en el juicio en su fondo, la cual según alegan fue una carta en donde un funcionario de la Unión informa al encargado del plan médico en la Unión Internacional en Estados Unidos, que elimine del plan médico al señor Acosta efectivo el 16 de febrero de 1996, por ser esa la fecha en que el apelante dejó de trabajar en la Unión. También plantea que la alegada justificación de su despido como consecuencia de la fusión de las Uniones es un subterfugio, ya que en Puerto Rico la fusión fue efectiva al momento en que los delegados de ambas Uniones

votaron a favor de la misma, lo que ocurrió el 27 de abril de 1996, cuando su despido fue efectivo en febrero de 1996. No le asiste la razón, veamos.

La acción incoada en el caso de autos ante el Tribunal de Primera Instancia fue instada al amparo de la Ley Núm. 45 del 18 de abril de 1935, según enmendada. ▊ Dicho estatuto legal dispone en lo pertinente al caso de autos que:

*"En los casos de inhabilitación para el trabajo de acuerdo con las disposiciones de este capítulo, el patrono vendrá obligado a reservar el empleo que desempeña el obrero o empleado al momento de ocurrir el accidente y a reinstalarlo en el mismo, sujeto a las siguientes condiciones:*

*(1) Que el obrero o empleado requiera al patrono para que lo reponga en su empleo dentro del término de quince días, contados a partir de la fecha en que el obrero o el empleado fuere dado de alta, y siempre cuando que dicho requerimiento no se haga después de transcurridos doce meses desde la fecha del accidente;*

*(2) Que el obrero o empleado esté mental y físicamente capacitado para ocupar dicho empleo en el momento en que solicite el patrono su reposición, y*

*(3) Que dicho empleo subsista en el momento en que el obrero o empleado solicite su reposición. (Se entenderá que el empleo subsiste cuando el mismo está vacante o lo ocupe otro obrero o empleado. Se presumirá que el empleo estaba vacante cuando el mismo fuere cubierto por otro obrero o empleado dentro de los treinta días siguientes a la fecha que se hizo el requerimiento de reposición.)*

*Si el patrono no cumpliere con las disposiciones de esta sección, vendrá obligado a pagar al obrero o empleado o a sus beneficiarios los salarios que dicho obrero o empleado hubiere devengado de haber sido reinstalado; además les responderá de todos los daños y perjuicios que le haya ocasionado. El obrero o empleado, o sus beneficiarios, podrán instar o tramitar la correspondiente reclamación de reinstalación y/o de daños en corte por acción ordinaria o mediante el procedimiento para reclamación de salarios, establecido en las secs. 3118 a 3132 del Título 32."* (Énfasis suplido)

Esta sección establece dos tipos de protección para el obrero que sufre un accidente del trabajo y se reporta y se acoge a los beneficios que ofrece la Ley de Compensaciones por Accidentes del Trabajo: (1) le impone al patrono el deber de reservarle al obrero por 12 meses el empleo en que se desempeñaba al momento de ocurrir el accidente, y (2) el trabajador tiene derecho a que lo repongan en ese mismo empleo, una vez sea dado de alta por el Fondo, si solicita del patrono que lo reponga y si se dan las tres condiciones establecidas en esta sección. *García v. Darex P.R., Inc.*, 148 D.P.R. 364 (1999).

Ahora bien, la protección que concede esta sección no es absoluta, ya que dentro de la legislación laboral, todo patrono tiene derecho a levantar la defensa de justa causa cuando se le acusa de despido injustificado. *Id*, a la pág. 380.

Sin embargo, la Ley del Sistema de Compensación por Accidentes del Trabajo no contiene una definición de lo que constituye *"justa causa"* para el despido. Ante esta situación, y en buena hermenéutica, debemos recurrir a otras leyes *in pari materia. Báez v. García Cooper Labs., Inc.,* 120 D.P.R. 145, 155 (1987); *Beauchamp v. Holsum Bakers of P.R.,* 116 D.P.R. 522, 526-527 (1985). Por ende, para determinar el significado de *"justa causa"* en el Art. 5A, debemos acudir a las circunstancias enumeradas en el Art. 2 de la Ley Núm. 80, *supra*, 29 L.P.R.A. sec. 185, conocida comúnmente como la *"Ley de Despido Injustificado"*. *Id.,* a la pág. 381 (Citas internas omitidas).

El Art. 2 de la Ley 80 de 30 de mayo de 1976 dispone que: *"[s]e entenderá por justa causa para el despido de un empleado de un establecimiento:*

*a. Que el obrero siga un patrón de conducta impropia o desordenada.*

*b. La actitud del empleado de no rendir su trabajo en forma eficiente o de hacerlo tardía y negligentemente o en violación de las normas de calidad del producto que se produce o maneja por el establecimiento.*

*c. Violación reiterada por el empleado de las reglas y reglamentos razonables establecidas para el funcionamiento del establecimiento siempre que copia escrita de los mismos se haya suministrado oportunamente al empleado.*

*d. Cierre total, temporero o parcial de las operaciones del establecimiento.*

*e. Los cambios tecnológicos o de reorganización, así como los de estilo, diseño o de naturaleza del producto que se produce o maneja por el establecimiento y los cambios en los servicios rendidos al público.*

*f. Reducciones de empleo que se hacen necesarias debido a una reducción en el volumen de producción, ventas o ganancias, anticipadas o que prevalecen al ocurrir el despido."*

No se considerará despido por justa causa aquél que se hace por mero capricho del patrono o sin razón relacionada con el buen y normal funcionamiento del establecimiento. ▪

En el caso de autos, no se cumple con el requisito establecido en el inciso 3 de la Ley de Compensaciones por Accidente del Trabajo anteriormente citado, ya que dicho inciso estipula que para que el obrero tenga derecho a la reposición **es imperativo que su puesto subsista en el momento que solicite su reposición**. Para esto, el puesto reclamado debe estar vacante u ocupado por otro empleado dentro de los treinta días siguientes a la fecha en que se hizo el requerimiento de reposición. Lo anterior no ocurrió en el caso de autos.

De la transcripción de la prueba se desprende que desde 1995, la ILGWU y UNITE comenzaron a perder miembros como consecuencia de varios cierres de talleres unionados. El propio demandante admitió que desde mucho antes que se reportara al FSE en octubre de 1992, varias compañías con quienes la ILGWU tenía convenios colectivos habían ya comenzado a cerrar sus puertas y que esto había continuado aún después que él se había reportado al FSE. Así las cosas, el apelante, durante el juicio, enunció los nombre de muchas de las compañías que habían cerrado, y así como de los trabajadores habían sido cesanteados. También declaró que estos cierres provocaron el despido de las uniones empleados por parte de las uniones ACTWU y la ILGWU.

De lo anterior se desprende que cuando el demandante fue dado de alta del FSE para el 24 de junio de 1996, ya se había eliminado su puesto desde el 16 de febrero de 1996, o sea unos cuatro meses antes. Esto es, no empece a que la ratificación de la fusión de las uniones se llevó a cabo en Puerto Rico para el 27 de abril de 1996, el Departamento de Organización el cual el apelante dirigía fue cerrado meses antes debido a la merma en la economía de las uniones ocasionada por los trabajadores cesanteados. Tan es así, que no sólo se eliminó el puesto, sino que posteriormente la Unión cerró sus operaciones, no dejando así duda alguna que la eliminación del departamento no fue un subterfugio para despedir al demandante, sino como producto de la crisis económica por la que estaba atravesando la industria de la aguja en ese momento.

Ahora bien, como segundo señalamiento de error, el apelante indica que erró el Tribunal de Primera Instancia al no tomar en consideración la evidencia presentada pertinente de las labores que había llevado a cabo durante su carrera, ya que dicho foro determinó que la Unión no tenía la obligación de reponerlo a una posición fuera de su clasificación ocupacional. En otras palabras, el apelante plantea que la Unión, al eliminar el

puesto que el ocupaba por las razones antes aludidas, tenía que reponerlo en cualquiera de las posiciones que ocupó mientras laboró en la Unión. Nuevamente, no le asiste la razón al apelante.

El Tribunal de Primera Instancia concluyó que el apelante no tenía derecho a ser reinstalado en el puesto de asistente de director regional de la IGLÚ, ya que dicho puesto no existía al momento en que fue solicitada la reinstalación. Fundamentó su decisión en lo establecido en las secs. 185b y 185c de Ley de Despido Injustificado, *supra*.

A esos efectos, el apelante, en el juicio en su fondo, expresó específicamente que:

*"En la unión, siempre fue política que cuando había cierre por economía en los talleres, que se siguiera un proceso de antigüedad y capacidad del empleado para hacer otro trabajo, si se llevaba a cabo el "bumping". Eso se conoce como el bompeo, en el argot laboral, el bompeo. El de más antigüedad empuja al de menos antigüedad. Y ese es, eso siempre fue así en los cierres de los demás talleres. Era la política que nosotros optábamos por eso, además, porque es una política justa."*

Como indicáramos anteriormente, la Ley de Compensación por Accidente del Trabajo dispone en lo pertinente al caso de autos, que el patrono viene obligado a **reservar el empleo que desempeña el obrero o empleado al momento de ocurrir el accidente** y a reinstalarlo en el mismo, siempre y cuando **dicho empleo subsista en el momento en que el obrero o empleado solicite su reposición.** Concurrimos con la determinación del Tribunal de Primera Instancia, toda vez que, al momento del apelante solicitar la reposición, dicho puesto no existía como consecuencia de los trámites de fusión de las Uniones ILGWU con la ACTWU. A saber, dicho puesto fue eliminado debido a la reorganización que se estaba llevando a cabo en la Uniones para efectuar la fusión. Acción que cumple cabalmente con lo dispuesto en la sec. 185(b) (e) de la Ley de Despido Injustificado, *supra*.

Por otro lado, el Tribunal de Primera Instancia determinó que la ILGWU tampoco tenía que retener al señor Acosta en el puesto de maestro u organizador, ya que estos puestos no son de la misma clasificación ocupacional que el puesto que él ocupaba al momento de acogerse a los beneficios del FSE. Vease 29 L.P.R.A. sec. 185c.

Por último, el tribunal recurrido determinó que el apelante tampoco tenía derecho a ser repuesto en la plaza de director del departamento de organización, ya que dicho puesto cesó de existir antes de que el apelante fuera dado de alta del FSE.

Por todos los fundamentos anteriormente esbozados, consideramos que en el presente caso no existen las circunstancias extraordinarias que se requieren, o los indicios de pasión, prejuicio, parcialidad o error manifiesto que nos deban compeler a intervenir con la discreción del tribunal apelado, mereciendo el mismo la deferencia del foro apelativo. *Rodríguez Oyola v. Machado Díaz,* 136 D.P.R. 250 (1994); *Cooperativa de Seguros Múltiples de Puerto Rico v. Lugo Torres,* 136 D.P.R. 203 (1994); *Pueblo v. Meléndez Rodríguez,* 136 D.P.R. 801 (1994); *Pueblo v. Torres García,* 137 D.P.R. 56 (1994). Igualmente consideramos que todos los hechos que merecieron credibilidad del tribunal de instancia están basados en prueba testifical fehaciente.

Por esta razón, las determinaciones del juzgador de primera instancia tienen que gozar de deferencia por este Tribunal, por la oportunidad superior que tuvo dicho foro para aquilatar la prueba testifical. *Pueblo v. Miranda Ortiz,* 117 D.P.R. 188 (1986); *Pueblo v. Pagán Díaz,* 111 D.P.R. 608 (1981).

Por otra parte, los señalamientos en apelación tienen que sustentarse con prueba suficiente. Las meras alegaciones no son suficientes, así como tampoco las conjeturas. *Pueblo v. López Guzmán,* 131 D.P.R. 865 (1992); *Pueblo v. Dones,* 106 D.P.R. 303 (1977); *Pueblo v. Pacheco,* 83 D.P.R. 285 (1961). Así también, es

claro el principio de que en ausencia de pasión, prejuicio, parcialidad o error manifiesto, un tribunal apelativo no debe intervenir en apelación con la apreciación de la prueba de instancia. *Monllor Arzola v. Sociedad de Gananciales*, 138 D.P.R.600 (1995).

## IV
En mérito a lo expuesto y conforme al derecho citado, se confirma la sentencia apelada.

Notifíquese.

Lo acordó y manda el Tribunal y lo certifica la Secretaria General.

Aida Ileana Oquendo Graulau
Secretaria General

### ESCOLIOS 2004 DTA 116

1. Véase pág. 37 de la transcripción de la prueba oral.

2. Véase pág. 57 de la transcripción de la prueba oral.

3. De la transcripción de la prueba oral del caso de autos, se desprende, que durante el período que el apelante estuvo reportado al FSE, agotó tanto su licencia de vacaciones como su licencia de enfermedad.

4. Cabe señalar que en la moción de sentencia sumaria que presentó la parte apelada ante el Tribunal de Primera Instancia señalan que el FSE no había relacionado la condición emocional del apelante con el trabajo. Sin embargo, el apelante presentó moción de reconsideración ante la Comisión Industrial, la cual, mediante resolución de 8 de julio de 1999, revocó la decisión del Administrador del FSE resolviendo que el apelante padecía de un trastorno de ajuste relacionado al ambiente laboral.

5. Véase Exhibit 10, págs. 201-204.

6. 11 L.P.R.A. sec. 7.

7. 29 L.P.R.A. sec. 185b.